**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Elizabeth Jo Baldwin, | ) | No. CV-14-01772-TUC-BGM |
| Plaintiff, | ) | |
| vs. | ) | **ORDER** |
| Carolyn W. Colvin,<br>Acting Commissioner of Social Security, | ) | |
| Defendant. | ) | |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 16). Defendant filed her Brief ("Response") (Doc. 17), and Plaintiff filed her reply (Doc. 18). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

**I.    BACKGROUND**

*A.    Procedural History*

On May 25, 2011, Plaintiff filed an application for Social Security Disability Insurance Benefits ("DIB") alleging disability as of September 9, 2009 due to ankle pain (left ankle injury), migraine headaches, fibromyalgia, chronic pain syndrome, fatigue, and knee pain. *See* Administrative Record ("AR") at 19, 21, 59, 94-96, 103-05, 116, 124, 183, 213, 216, 239, 271. Plaintiff's date last insured was December 31, 2014. *Id.* at 21, 95, 104, 183,

213, 239.  The Social Security Administration ("SSA") denied this application on September 23, 2011.  *Id.* at 19, 94-102, 116-19.  On October 26, 2011, Plaintiff filed a request for reconsideration, and on January 30, 2012, SSA denied Plaintiff's request.  *Id*. at 19, 53-54, 103-15, 124-26.  On February 24, 2012, Plaintiff filed her request for hearing.  *Id.* at 19, 128.  On September 11, 2012, a hearing was held before Administrative Law Judge ("ALJ") George W. Reyes.  AR at 19, 56-93.  The ALJ issued an unfavorable decision on October, 2012.  *Id.* at 16-28.  On November 19, 2012, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on December 23, 2013, review was denied.  *Id.* at 1-3, 14-15.  On February 14, 2014, Plaintiff filed this cause of action.  Compl. (Doc. 1).

### B.   Factual History

Plaintiff was fifty-two (52) years old at the time of the administrative hearing and forty-nine (49) at the time of the alleged onset of her disability.  AR at 26, 74, 95, 104, 183, 189, 213, 239, 271.  Plaintiff obtained a high school equivalency degree, and has taken some college courses.  *Id.* at 26, 74, 89, 94, 103, 217.  Prior to her alleged disability, Plaintiff worked for Domino's Pizza and at call centers for TeleTech and Citibank, as well as for convenience stores as a cashier.  *Id.* at 74-75, 101, 113, 196-210, 226-31, 259, 280.

On August 6, 2011, Plaintiff filled out an Exertional Daily Activities Questionnaire, indicating that she "get[s] up early and ha[s] household chores to do." *Id.* at 223.  Plaintiff described the chores as "mak[ing] the bed and try[ing] to sweep and/or vacuum . . . feed[ing] [her] animals, wash[ing] dishes, do[ing] laundry, cook[ing] dinner, [and] water[ing] plants outdoors."  *Id.*  Plaintiff indicated that she walks on their acre property to do the watering and feeding, and also waters a garden.  AR at 223.  Plaintiff reported that she does this two (2) or more times per week, and if she doesn't feel up to it, her husband takes care of the chores after work.  *Id.*  Plaintiff reported "chronic migraines and a lot of muscle and joint pain with swelling which are very tiring" and cause her to "lay down at least one or more times per day."  *Id.*  She also reported having difficulty sleeping.  *Id.*; *see also* AR at 242.  Plaintiff indicated that she carries laundry and puts it away, but cannot lift things that are heavier than

- 2 -

approximately fifteen (15) pounds, "as it creates new muscle pain and fatigue." AR at 224. Plaintiff indicated that she grocery shops once per month and cooks three (3) to four (4) times per week, and her family does the rest. *Id.* Plaintiff further indicated that she only does light dusting, work in the kitchen, and laundry. *Id.* She also reported that she used to be able to clean thoroughly, but can no longer do so. *Id.* Plaintiff stated that she has headaches and constant neck pain, as well as the Fibromyalgia[,]" in addition to "stomach issues I have called irritable bowel syndrome." *Id.* at 225.

On September 9, 2011, Plaintiff filled out a Headache Questionnaire indicating that she has had severe headaches since 1998, and has them at least four (4) days per week. AR at 235-36. Plaintiff reported that the headaches last anywhere from one (1) day to a week or longer. *Id.* at 235. Plaintiff further reported that the headaches cause pain on either side of her face or head, and she needs to avoid light, gets sick to her stomach with vomiting, and has difficulty sleeping. *Id.* Plaintiff reported that there is no specific activity that triggers her headaches, and that she must lay down in a quiet, dark room. *Id.* Plaintiff further stated that her medications "simply take[] the edge off, nothing [she] [has] ever taken has completely relieved the pain." *Id.* at 236. Plaintiff further reported that she cannot drive, because the pain is too severe. AR at 236.

On October 3, 2011, Plaintiff reported that she could "only shower every two to three days a week as opposed to daily[,]" her daughter combs her hair for her, she wears only loose clothing that do not have a lot of buttons or zippers, and eats "easy to get food such as yogurt and jello or prepared foods that can be heated in the microwave." *Id.* at 245.

### 1. Plaintiff's Testimony

At the administrative hearing, Plaintiff testified that she has not worked since September 9, 2009, but had looked for work in customer service since that time. AR at 59-60. Plaintiff further testified that she had been unsuccessful in securing work, and had received unemployment benefits through the State of Arizona. *Id.* at 59-61. Plaintiff also testified that she received unemployment until the second quarter of 2011, and had told the

State of Arizona that she was able to work in order to receive those benefits. *Id*. at 61.

More specifically, Plaintiff testified that her chronic migraines, as well as pain in her legs, neck, shoulders, elbows, hips, and left ankle contributed to her inability to work. *Id*. at 61-62.   Plaintiff further testified that since September 9, 2009, her health has gotten worse. *Id*. at 62.  Plaintiff testified that her "pain has gotten worse, the swelling has become more pronounced, the stiffness." AR at 63.  Plaintiff further testified that in September 2009, she was able to do minimal housework, but now cannot do any housework or does very, very little.  *Id*.  Plaintiff testified that the housework she can do includes putting clothes in the laundry basket, dishes in the sink, and possibly light dusting.  *Id*.  Plaintiff further testified that her husband and daughter, who lives with them, do most of the housework.  *Id*.  Plaintiff testified that it is possible her decrease in health is related to stress arising from finances and being in constant pain.  *Id*.

Plaintiff testified that she sees her primary care physician approximately once per month or once every other month.  AR at 64.  Plaintiff denied ever abusing alcohol, and estimated the last time she had a drink was approximately five (5) years prior.  *Id*. at 64-65.  When the ALJ asked about her medical records indicating that she used alcohol "rarely," Plaintiff testified that she did not recall making such a statement, but did not deny having made it either.  *Id*. at 72-73.  Plaintiff further testified that she had used marijuana and cocaine in the past, but that her last use occurred between twenty-three (23) and twenty-five (25) years before.  *Id*. at 65.  Plaintiff also testified that she did not abuse prescription drugs, but that she has a prescription for methadone for her pain.  *Id*. at 66.  Plaintiff admitted that in June 2010 she was admitted to Tucson Medical Center ("TMC") after taking one of her husband's vicodin for her pain, but she did not recall making the statements reflected in her medical record from that date.  AR at 66-68, 72-73.  Plaintiff further testified that she was admitted for an accidental overdose.  *Id*. at 73-74.

Plaintiff testified that she can lift approximately eight (8) pounds with either arm without hurting herself, equating this to a gallon of milk.  *Id*. at 68-69.  Plaintiff further

testified that she has been so limited for the past year and half with her right arm, but since July 2000 with her left arm. *Id.* at 69. Plaintiff testified that she rarely drives. *Id.* at 70. Plaintiff further testified that she drove approximately three (3) weeks prior from her home in Vail to her doctor's office, because her husband was unavailable to take her. AR at 70. Plaintiff also testified that her doctor wants her to walk as much as she can. *Id.* at 70-71. Plaintiff testified that she walks around the hiking trail on her acre property two or three times per week. *Id.* at 71. Plaintiff also testified that she walks for approximately twenty (20) minutes, sometimes stopping to rest and sometimes not. *Id.* Plaintiff further testified that she swims, which is strongly recommended by her doctor, twice per week. *Id.* Plaintiff estimated that she swims for approximately twenty (20) minutes at a time. AR at 71-72. Plaintiff testified that the exercise helps momentarily; however, nothing eliminates the pain completely. *Id.* at 72.

Plaintiff testified that she obtained her high school equivalency degree and had taken some college courses. *Id.* at 74, 89. Plaintiff further testified that she had worked at call centers from 1999 to 2009. *Id.* Plaintiff testified that for approximately one (1) year prior to that she was a manager in training for Domino's Pizza. *Id.* at 74. Plaintiff further testified that she left Domino's Pizza to work at TeleTech, because it offered better pay and benefits. *Id.* at 75. Plaintiff left TeleTech in 2004 to work at the Citibank call center, again for better pay and better benefits. AR at 75. Plaintiff testified that she was terminated from Citibank in 2009, because she could not minimize the time on each call below the company policy; however, Plaintiff further testified that she was also using her leave under the Family and Medical Leave Act ("FMLA") for migraines. *Id.* at 75-76; *see also* AR at 222. Plaintiff believes that part of why she was terminated related to her absences due to migraines. *Id.* at 80; *see also* AR at 216, 236.

Plaintiff testified that she has been prescribed methadone for her pain, levothyroxine for her thyroid disorder, alprazolam for anxiety, carisoprodol for muscle pain, citalopram for depression gemfibrozil for cholesterol, and trazodone for sleep. *Id.* at 76-77. Plaintiff further

- 5 -

1   testified that the medicines cause side effects such as sleepiness, dizziness, drowsiness,

2   blurred vision, and dry mouth, as well as causing her memory to be "fuzzy." *Id.* at 77.

3   Plaintiff testified that she naps once or twice per day, usually for about twenty (20) minutes,

4   but sometimes up to an hour.  AR at 77-78.  On days when she cannot fall asleep, Plaintiff

5   testified that she still lays down and closes her eyes to rest. *Id.* at 78.

6       Plaintiff further testified that she has migraines on almost a daily basis, and that her

7   methadone prescription is for both her headache pain and her fibromyalgia pain. *Id.* at 78-79.

8   Plaintiff testified that her migraines last anywhere from eight (8) hours to ten (10) days. *Id.*

9   at 79.  In order to treat them, she places a warm wrap around her neck and lays down in a

10  dark room.  AR at 79; *see also* AR at 236.  While having a migraine, Plaintiff testified that

11  she tries to move as little as possible.  AR at 79-80.  Plaintiff further testified that she has

12  been suffering from migraines for approximately ten (10) to fifteen (15) years. *Id.* at 80.

13  Plaintiff also testified that she was able to work, because she had an understanding manager

14  and the FMLA to protect her job, which allowed her to "go home to a dark room and rest."

15  *Id* at 80-81.

16      Plaintiff testified that she is not receiving any psychiatric treatment, but has been

17  prescribed alprazolam and citalopram for her anxiety and depression. *Id.* at 81.  Plaintiff

18  further testified that the pain causes her depression, and that it causes her to not "feel like

19  doing anything with anyone" and "just lay around[.]" *Id.*  Plaintiff also testified that she

20  wishes she could do more with her family, as well as work.  AR at 81-82.

21              **2. Vocational Expert Alan Cummings's Testimony**

22      Alan E. Cummings, Ph.D. testified as the vocational expert at the administrative

23  hearing.  AR at 83.  The VE asked Plaintiff for clarification regarding her work experience.

24  *Id.* at 84.  Plaintiff testified that her call center experience included taking in-bound calls and

25  looking up information on the computer for the client. *Id.* at 84; *see also* AR at 227-28, 259,

26  280.  Plaintiff further testified that her experience at Domino's Pizza included both pizza

27  delivery and assistant managing. *Id.* at 85; *see also* AR at 229, 259, 280.  The VE described

28

Plaintiff's past relevant work as an assistant manager as Dictionary of Occupational Titles ("DOT") code 189.167-018. *Id.* The DOT characterized that work as light, skilled, and with a Specific Vocation Preparation ("SVP") of 6. AR at 85. The VE characterized the call center work as an information clerk, DOT code 237.367-022, sedentary, semi-skilled, with an SVP of 3. *Id.*

The ALJ asked the VE a hypothetical regarding an individual of the same age, education, and vocational background as the Plaintiff. *See id.* at 86-89. In the hypothetical, the ALJ asked about someone who was "limited to light level work[,] . . . cannot use ladders, ropes or scaffolds and can only occasionally use ramps or stairs and occasionally kneel, crouch or crawl[,] must avoid even moderate to [sic] hazards[,] hazards are commonly defined as either unprotected heights or dangerous machinery[,] cannot perform tasks in a fast paced environment[,][1] . . . can attend and concentrate for two hours then needs to take the customary 10 to 15 minute break[,] [c]an then attend and concentrate for two more hours then needs to take the traditional, or . . . customary 30 to 60 minute break[,] . . . [c]an then attend and concentrate for two more hours then needs to take the customary 10 to 15 minute break[,] [a]nd can then attend and concentrate for two more hours[,] [a]nd that . . . ends the eight hour work day[,] . . . would need a sit/stand option every hour or so for one to two minutes[,] . . . [and] would need to take public transportation as needed to get to and from the work site." *Id.* at 86-87. Dr. Cummings testified that such an individual would be able to do Plaintiff's past relevant work at the call center. *Id.* at 87. The ALJ asked whether the call center work would have a pace equivalent to a McDonald's restaurant at noon time, which Dr. Cummings confirmed was possible. AR at 87-88. Accordingly, Plaintiff's past relevant work was excluded. *Id.* at 88. Dr. Cummings testified that there would be other

---

[1]The ALJ described "the kind of fast paced production environment the claimant could not work at [as] the pace reflected in a McDonald's restaurant at noon time or the pace reflected in the conveyor belt in the I Love Lucy episode with the chocolates on the conveyor belt whizzing by Ethel and Lucy. AR at 86.

jobs available in the national or regional economy.  *Id.* at 89.  Dr. Cummings described the job of packager, DOT number 559.687-074, light, unskilled, with an SVP of 2 as a possibility.  *Id.* at 90.  Dr. Cummings further testified that there are about 434,000 jobs nationally, and 5,800 in Arizona.  *Id.*  Dr. Cummings testified that a second possible job would be that of inspector, DOT number 727.687-066, light, unskilled, with an SVP of 2. AR at 90.  Dr. Cummings further testified that there are approximately 400,000 inspector jobs nationally, and 5,000 in the State of Arizona.  *Id.*  Dr. Cummings testified that a third possibility would be assembler, DOT number 731.687-034, light, unskilled, with an SVP of 2. *Id.* at 90.  The assembler job has 235,000 positions nationally, and 2,100 in Arizona.  *Id.* Dr. Cummings also testified that the inspector and assembler jobs are bench work, as opposed to production line jobs.  *Id.*  Dr. Cummings confirmed that his testimony was consistent with the Dictionary of Occupational Titles.  AR at 90.  Dr. Cummings also testified that the DOT job numbers did not account for a sit/stand option; however, based on his personal experience, he had selected jobs that offered a sit/stand option.  *Id.* at 92.

The ALJ expanded his hypothetical to an individual who "for whatever reason, all physical, all mental or a combination of both is unable to attend and concentrate in the two hour blocks of time that I previously outlined for you in the RFC presented."  *Id.* at 90.  Dr. Cummings testified that such an individual would not be able to maintain employment with continuity.  *Id.*  Dr. Cummings further testified that such an employee would not be able to maintain the production pace required by most employers.  *Id.*  Dr. Cummings also testified that for most unskilled workers, no more than one absence per month would be tolerated. AR at 91.  Dr. Cummings testified that he relied on a study by the International Association of Rehabilitation Professionals for this information.  *Id.*  Dr. Cummings further testified that if an individual were to miss three (3) days or more per month, there would not be any jobs available.  *Id.* at 92.

### 3.  Plaintiff's Medical Records

On September 3, 2009, Plaintiff was seen by Robert Smith, M.D. for an upper

respiratory infection.  AR at 362.  Dr. Smith noted that Plaintiff had "a little fibromyalgia, some hypothyroidism and insomnia."  *Id.*  On January 7, 2010, Plaintiff saw Dr. Smith for refills of her methadone and Xanax.  *Id.* at 361, 429.  Dr. Smith reported that Plaintiff was between insurances "and her fibromyalgia is causing her a lot of pain."  *Id.*  Dr. Smith also prescribed Neurontin to Plaintiff.  *Id.*  On May 4, 2010, Plaintiff saw Dr. Smith for a follow-up.  AR at 359-60, 427-28.  Plaintiff reported that she was having stomach problems.  *Id.* at 360, 427.  Dr. Smith reported that Plaintiff had "fibromyalgia as well as chronic reflux esophagitis."  *Id.*  Dr. Smith further reported that she was "currently much better."  *Id.*

On June 8, 2010, Plaintiff was admitted to Tucson Medical Center ("TMC") and discharged on June 11, 2010.  *See* AR at 292-311, 314-27, 426.  On June 8, 2010, Plaintiff was admitted "presenting with [o]verdose."  *Id.* at 302, 314.  Sean Mayo, M.D. noted that "patient recently started on benzo by PCP and is taking narcotics and benzos accidentally inappropriately."  *Id.*  A review of Plaintiff's systems indicated abdominal pain, confusion, and decreased concentration, with all other systems negative.  *Id.* at 303, 314.  Plaintiff's physical exam was normal, except her speech was "delayed and slurred" and she was "slowed."  *Id.* at 304, 316.  A head computed tomography ("CT") performed on the same date was "unremarkable" and showed "[n]o significant interval change from prior outside head CT study dated 06/19/2008."  AR at 309.  On June 9, 2010, William G. Odette, M.D. noted that Plaintiff "took husbands [sic] 'vicodan' denies other Rx but drug screen positive Benzos and Narcotics."  *Id.* at 299, 320.  Dr. Odette further noted that Plaintiff reported that she took the prescription for three months of lower abdominal pain for which she sought no evaluation or treatment.  *Id.*  On June 10, 2010, Sarah S. Akhunji, M.D. performed a physical examination of Plaintiff, and which was unremarkable.  *Id.* at 295-96, 324.  On June 11, 2010, Dr. Akhunji reported that Plaintiff was "[s]een by behavioral health for O[ver ] D[ose]."  *Id.* at 294, 327.  Plaintiff "[r]eported that she had increased pain issues that have since resolved[,] [a]gree[d] to avoid abusing narcotic medications and [would] follow closely with [her primary care physician.]"  AR at 294, 327.  Dr. Akhunji also noted that Plaintiff was

1   "[o]n methadone for chronic pain." *Id.* On June 14, 2010, Plaintiff saw Dr. Smith for a

2   follow-up after her hospitalization. *Id.* at 357-58, 425. Dr. Smith reported that her hospital

3   stay was due to "irritable bowel syndrome." *Id.* at 357, 425. Dr. Smith further reported that

4   she had progressively taken "more and more alprazolam to where she had about six pills on

5   board." *Id.* On the same date, Plaintiff had blood drawn and analyzed. AR at 370, 424.

6       On July 30, 2010, Plaintiff saw Dr. Smith for a refill of her methadone prescription.

7   *Id.* at 356, 423. Dr. Smith reported that she "seems to be doing quite a bit better." *Id.* Dr.

8   Smith further noted, however, that she was "very definitely having some depression right

9   now." *Id.* Dr. Smith also noted that Plaintiff has fibromyalgia, but her physical exam was

10  unremarkable. *Id.*

11      On September 16, 2010, Plaintiff saw Dr. Smith to discuss her pain medication. AR

12  at 354-55, 422. Plaintiff had blood work done on the same date. *Id.* at 414-20. On

13  September 24, 2010, Plaintiff was again seen by Dr. Smith for a refill of her  pain

14  medication, specifically oxycodone. *Id.* at 345, 412. Dr. Smith noted that Plaintiff has

15  chronic neck pain and fibromyalgia, and was also complaining of "some fatigue." *Id.* Dr.

16  Smith's physical examination was unremarkable, and he further noted that "she has her

17  normal [Activities of Daily Living] that she can do." *Id.* On September 30, 2010, Plaintiff

18  had blood drawn and analyzed. AR at 364-69, 409-11.

19      On October 13, 2010, Plaintiff saw Dr. Smith to discuss her laboratory analyses. *Id.*

20  at 343-44, 407-08. Dr. Smith noted that she had hyperlipidemia and was glucose intolerant.

21  *Id.* at 343, 407. Dr. Smith further noted that she had fibromyalgia, as well as insomnia, and

22  oxycodone causes her to get very drowsy. *Id.* Dr. Smith's physical examination was

23  unremarkable. *Id.* at 343-44. On November 16, 2010, Plaintiff's blood work indicated the

24  presence of Morphine, as well as "evidence of taking an unprescribed Benzodiazepine

25  medication." AR at 346-51.

26      On December 16, 2010, Plaintiff saw Dr. Smith for a methadone refill, and states that

27  she is "continuing to have trouble with her headache." *Id.* at 342, 406. Dr. Smith also

28

1    indicated that Plaintiff reported she had been taking old Soma and old morphine that she has

2    been taking for the headache, but that "[s]he guarantee[d] [him] that she [was] not getting any

3    meds from any other physicians and [he] [did] not have reason to doubt her." *Id.* Dr.

4    Smith's physical examination was unremarkable. *Id.* Plaintiff had blood drawn and analyzed

5    on the same date, showing positive for morphine and methadone. *Id.* at 403-05.

6        On January 19, 2011, Plaintiff saw Dr. Smith to follow-up with her laboratory results,

7    but she had not been on her thyroid medication long enough for an accurate determination.

8    AR at 341, 402. Plaintiff was scheduled to return on February 16, 2011 for a blood draw.

9    *Id.* On March 17, 2011, Plaintiff saw Dr. Smith for a refill on her methadone. *Id.* at 340,

10   401. Dr. Smith noted that "[i]t seems to be working quite well for her chronic fibromyalgia."

11   *Id.* Dr. Smith further noted that further blood work to follow-up on her thyroid medicine was

12   necessary. *Id.* Accordingly, such laboratory analysis was done. AR at 363, 400.

13       On May 13, 2011, Plaintiff saw Dr. Smith for a refill of her pain medication. *Id.* at

14   338-39, 398-99. Dr. Smith noted that "[t]here was also some confusion about whether she

15   should be taking two pain medicines at a time when in reality she only needs to take the

16   levothyroxine 200 mcg tabs one a day." *Id.* at 339, 399. Dr. Smith noted Plaintiff's pain as

17   "cervicalgia and migraines[,]" and reported that "[s]he seems to be doing quite well so we

18   will keep that prescription going and that was refilled." *Id.* On August 4, 2011, Plaintiff saw

19   Dr. Smith for a pain medication refill and ear infection. *Id.* at 397, 444. Dr. Smith's physical

20   examination was unremarkable, except for the ear infection in Plaintiff's right ear. AR at

21   397, 444. On August 6, 2011, Plaintiff had blood work done which indicated methadone, but

22   no other drugs. *Id.* at 396, 443.

23       Pursuant to request by the Arizona Department of Economic Security ("AZDES"),

24   Plaintiff was examined by Jerome Rothbaum, M.D. on September 14, 2011. *Id.* at 372-82.

25   Dr. Rothbaum indicated that he had reviewed Plaintiff's medical records as part of his

26   examination. *Id.* at 374. Dr. Rothbaum reported Plaintiff's chief complaints as fibromyalgia,

27   migraine headaches, irritable bowel syndrome, and diffuse bodily pain. *Id.* Dr. Rothbaum

28                                          - 11 -

1   noted that Plaintiff reported "that the fibromyalgia was diagnosed approximately three years

2   ago, although she states that she has had symptoms of chronic diffuse bodily pain for many

3   years[,] [and] [s]he describes pain, swelling, fatigue, and associated irritable bowel type

4   symptoms." AR at 374.  Dr. Rothbaum further reported that Plaintiff also "complain[ed] of

5   pain and swelling of the right knee."  *Id.*  Plaintiff had a partial right knee replacement, but

6   had not followed up with her doctor.  *Id.*  Plaintiff reported her neck pain as related to

7   compressed discs in the neck, and "migraine type headaches which consist of promontory

8   tearing of the eyes and usually unilateral pounding headache, either one side or the other,

9   particularly associated with phonophobia and photophobia for which she goes into a dark

10  room and lies down." *Id.* at 375.  Plaintiff reported "that these headaches occur almost every

11  day." *Id.* Dr. Rothbaum's review of Plaintiff's systems was unremarkable, although Plaintiff

12  reported that "[s]he has been told she has 'a spot on the lung,' which has been attributed to

13  valley fever[,] [and] . . . apparently is stationary." AR at 375.  Plaintiff reported smoking "a

14  cigarette only rarely" and "apparently did consume a considerable amount of alcohol but

15  stopped in 1988." *Id.*  Plaintiff also "denie[d] the use of illicit drugs." *Id.*  Dr. Rothbaum's

16  physical examination "disclosed fairly typical trigger points involving the right cervical

17  muscles, the right lateral trapezius, the left medial and lateral trapezius, the right sacroiliac

18  area, the pectoral areas bilaterally, the medial areas of both elbows, [and] the right knee

19  medially and laterally." *Id.* at 376.  Dr. Rothbaum further indicated that Plaintiff "mentioned

20  at the beginning that she was having a migraine during this examination." *Id.*  Dr. Rothbaum

21  reported that Plaintiff dressed and undressed normally, was able to squat approximately fifty

22  (50) percent of normal, limited by her right knee, walked with a slight antalgic gait and

23  limping on the right leg, and was able to get on and off the examining table without

24  difficulty.   AR at 377.   Dr. Rothbaum's impressions included migraine headaches;

25  fibromyalgia; status post right knee replacement; status post repair of Achilles tendon tear,

26  remote, left ankle; irritable bowel syndrome; status post cholecystectomy; history of remote

27  bilateral carpal tunnel release; cervical spondylosis; and depression. *Id.* at 377.  X-rays of

28

1   Plaintiff's left ankle indicated "[m]oderate osteophytic formation . . . off the calcaneus at the

2   insertion of the plantar aponeurosis." *Id.* at 372.  X-rays of Plaintiff knees indicated that

3   Plaintiff had "[m]oderate degenerative change identified involving the medial compartment

4   of both knees." *Id.* at 373.

5        Dr. Rothbaum completed a "Medical Source Statement of Ability to Do Work-Related

6   Activities (Physical)" regarding Plaintiff. *Id.* at 378-81.  Dr. Rothbaum diagnosed Plaintiff

7   with fibromyalgia, status post right total knee arthroplasty, obesity, and cervical spondylosis.

8   AR at 378.  Dr. Rothbaum opined that these would impose a limitation for twelve (12)

9   continuous months.  *Id.*  Dr. Rothbaum further opined that Plaintiff was limited in her ability

10  to lift and/or carry to twenty (20) pounds occasionally, and 10 pounds frequently. *Id*. at 378-

11  79.  Dr. Rothbaum noted Plaintiff would be limited in her ability to stand and/or walk to at

12  least two (2) hours, but less than six (6) hours in an eight (8) hour day. *Id.* at 379.  Dr.

13  Rothbaum further opined that Plaintiff had no limitation in sitting, and was unlimited in

14  seeing, hearing, and speaking. *Id.*  Dr. Rothbaum indicated that Plaintiff could never climb

15  ladder, rope or scaffolds; could occasionally climb ramps and stairs, stoop, kneel, crouch, and

16  crawl; and had no limitation on reaching, handling, fingering or feeling. AR at 380.  Dr.

17  Rothbaum also indicated that Plaintiff was restricted in working around heights and moving

18  machinery, but was unrestricted with regard to working around extremes in temperature,

19  chemicals, dust, fumes, gases, or excessive noise. *Id.*

20       Pursuant to request by the Commissioner, on September 22, 2011, Plaintiff's medical

21  records were reviewed by Martha A. Goodrich, M.D. *See id.* at 94-102.  On September 29,

22  2011, Plaintiff saw Dr. Smith for a refill of her methadone. *Id.* at 395, 442.  Dr. Smith's

23  examination was unremarkable. *Id.*  On September 30, 2011, a drug screen was performed,

24  with only methadone detected. AR at 394, 441.

25       On December 13, 2011, Plaintiff saw Dr. Smith for a medication review, and "refill

26  on Xanax and Soma." *Id.* at 440, 456-57.  Dr. Smith indicated that "[t]he patient does have

27  fibromyalgia and does need a refill on her methadone as of the 22nd or 23rd of this month."

28

1   *Id.* at 440, 456.  Dr. Smith's examination was otherwise unremarkable.  *Id.* at 440, 456-57.

2   Pursuant to request by the Commissioner, on January 26, 2012, Plaintiff's medical

3   records were reviewed on reconsideration by Stephen S. Dickstein, M.D.  *See id.* at 103-114.

4   On February 16, 2012, Plaintiff saw Dr. Smith for a medication consult and refills.  AR at

5   454-55.  Dr. Smith's examination was unremarkable, and he noted Plaintiff's "[w]ell-

6   controlled fibromyalgia."  *Id.* at 455.

7   On April 10 and 11, 2012, Plaintiff had blood work done.  *Id.* at 459-61.  On April 12,

8   2012, Plaintiff saw Dr. Smith for medication refills and to discuss her lab results.  *Id.* at 452-

9   53.  Dr. Smith noted that "[h]er labs indicate that she is not getting enough thyroid at this

10   time.  *Id.* at 453.  Dr. Smith further noted that Plaintiff "still suffers from chronic

11   fibromyalgia and needs a refill on her medication today . . . [s]he is on methadone and it

12   seems to be working reasonably well."  AR at 453.

13   On June 7, 2012, Plaintiff saw Dr. Smith for a refill of her methadone prescription,

14   consult regarding alprazolam, and requesting disability paperwork to be filled out.  *Id.* at 450-

15   51.  Dr. Smith noted that Plaintiff's "disability is based on fibromyalgia and multiple

16   migraine headaches[,] [and] . . . [she] simply cannot work."  *Id.* at 451.  Dr. Smith further

17   noted that Plaintiff "is on a great deal of medication[.]"  *Id.*  On June 8, 2012, Plaintiff had

18   blood work done, which indicated the presence of benzodiazepines and methadone.  *Id.* at

19   458.

20   On July 30, 2012, Plaintiff again saw Dr. Smith for a prescription consult and

21   disability paperwork.  AR at 471-72.  Plaintiff "desribe[d] her pain at usually a 4 to 5 level"

22   when taking methadone.  *Id.* at 472.  Plaintiff also reported that the methadone causes her to

23   be "confused at times[.]"  *Id.* at 471-72.  Plaintiff also had blood work done, which only

24   detected methadone.  *Id.* at 473.  On this same date, Dr. Smith filled out a Multiple

25   Impairment Questionnaire regarding Plaintiff.  *Id.* at 462-69.  Dr. Smith diagnosed Plaintiff

26   with "[f]ibromyalgia, chronic migraines, and thyroid disorder[,] . . . [and] also has insomnia

27   due to pain and anxiety disorder, as well as depression."  AR at 462.  Dr. Smith noted that

28

there is no cure for either her fibromyalgia or chronic migraines, only pain management. *Id.*
Dr. Smith further noted that Plaintiff "suffers with ongoing pain and swelling from
Fibromyalgia and has daily migraine headaches." *Id.* at 463. Dr. Smith described the nature
of Plaintiff's pain as "widespread" and including "swelling of joints." *Id.* Dr. Smith also
indicated that Plaintiff's "[m]igraines cause vomitting [sic] and leave [her] lying in a dark
room." *Id.* Dr. Smith described the frequency of Plaintiff's pain as constant, and rated her
pain as a 9-10, on a scale of one (1) to ten (10), with ten (10) being the most severe pain. AR
at 464. Dr. Smith described Plaintiff's fatigue as a 4-6, on a scale of one (1) to ten (10), with
ten (10) being the most severe fatigue. *Id.* Dr. Smith opined that Plaintiff could sit for 1-2
hours in an eight (8) hour day, and stand or walk for 0-1 hour in an eight (8) hour day. *Id.*
Dr. Smith further indicated that it was not recommended for Plaintiff to sit or stand
continuously in a work setting. *Id.* at 464-65. Dr. Smith also indicated that Plaintiff could
lift or carry 0-5 pounds occasionally, but never any more than that. *Id.* at 465. Dr. Smith
indicated that Plaintiff's swelling of hands and arms from the fibromyalgia limited her ability
to repetitively reach, handle, finger or lift. AR at 465. Dr. Smith further indicated that
Plaintiff was essentially precluded on both sides from grasping, turning, or twisting objects;
using fingers or hands for fine manipulations; and using arms for reaching, including
overhead. *Id.* at 465-66. Dr. Smith stated that physical therapy and injections failed. *Id.* at
466. Dr. Smith also stated that Plaintiff's symptoms would likely increase in a competitive
work environment, and she cannot keep her neck in a constant position. *Id.* Dr. Smith
further opined that Plaintiff could not do full-time work, and her pain, fatigue and other
symptoms would frequently interfere with her attention and concentration. *Id.* at 467. Dr.
Smith indicated that Plaintiff's symptoms would last at least twelve (12) months, and that
emotional factors, in the form of depression, contribute to the severity of her symptoms. AR
at 467. Dr. Smith stated that Plaintiff was not a malingerer and was "incapable of even 'low
stress'" work. *Id.* Dr. Smith opined that Plaintiff would need to take frequent unscheduled
breaks, and would have good days and bad days. *Id.* at 467-68. Dr. Smith further opined that

1    Plaintiff would be absent from work more than three (3) times per month. *Id.* at 468. Dr.

2    Smith indicated that Plaintiff "experiences ear infections, and flu-like symptoms up to once

3    per month or less frequently." *Id.* Dr. Smith indicated that Plaintiff would need to avoid

4    noise, fumes, gases, temperature extremes, dust, and heights, could not push, pull, kneel,

5    bend or stoop, and had limited vision. AR at 468.

6        On August 28, 2012, Dr. Smith provided a written report indicating that he believed

7    Plaintiff's symptoms were due to Fibromyalgia. *Id.* at 475-76. Dr. Smith listed Plaintiff's

8    medications and noted that they have side effects, including preventing her from driving. *Id.*

9    at 475. Dr. Smith further opined that she will not recover from the Fibromyalgia "as there

10   is no way to fully treat the pain and other symptoms." *Id.* at 476.

11

12       **II.     STANDARD OF REVIEW**

13       The factual findings of the Commissioner shall be conclusive so long as they are

14   based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3);

15   *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the

16   Commissioner's denial of disability insurance benefits when the ALJ's findings are based

17   on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*

18   *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v.*

19   *Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

20       Substantial evidence is "'more than a mere scintilla[,] but not necessarily a

21   preponderance." *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871,

22   873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014).

23   Further, substantial evidence is "such relevant evidence as a reasonable mind might accept

24   as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

25   Where "the evidence can support either outcome, the court may not substitute its judgment

26   for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016,

27   1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).

28

1  Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must

2  consider the entirety of the record weighing both evidence that supports as well as that which

3  detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

4

5  **III.    ANALYSIS**

6        The Commissioner follows a five-step sequential evaluation process to assess whether

7  a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows:

8  Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is not

9  disabled; step two considers if the claimant has a "severe medically determinable physical

10 or mental impairment[.]" If not, the claimant is not disabled; step three determines whether

11 the claimant's impairments or combination thereof meet or equal an impairment listed in 20

12 C.F.R. Pt. 404, Subpt. P, App. 1.  If not, the claimant is not disabled; step four considers the

13 claimant's residual functional capacity and past relevant work.  If claimant can still do past

14 relevant work, then he or she is not disabled; step five assesses the claimant's residual

15 functional capacity, age, education, and work experience.  If it is determined that the

16 claimant can make an adjustment to other work, then he or she is not disabled.  20 C.F.R. §

17 404.1520(a)(4)(i)-(v).

18        In the instant case, the ALJ found that Plaintiff met the insured status requirements

19 of the Social Security Act through December 31, 2014, and was not engaged in substantial

20 gainful activity since September 9, 2009.  AR at 21.  At step two of the sequential evaluation,

21 the   ALJ   found   that   "[t]he   claimant   has   the   following   severe   impairments:

22 fibromyalgia/chronic fatigue syndrome, depression and anxiety (20 CFR 404.1520(c))." *Id.*

23 At step three, the ALJ found that Plaintiff does "not have an impairment or combination of

24 impairments that meets or medically equals the severity of one of the listed impairments in

25 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."

26 *Id.* at 22.  At step four, the ALJ found that Plaintiff had:

27        the residual functional capacity (RFC) to perform light work as defined in 20

28                                          - 17 -

1
2
3
4
5
6

> CFR 404.1567(b) except that she cannot climb ladders, ropes, or scaffolds; she is further limited to occasionally climbing ramps or stairs, and occasionally kneeling, crouching and crawling; she should avoid even moderate exposure to hazards, e.g., such as [sic] unprotected heights or dangerous machinery; she cannot perform tasks in a fast-paced production environment; and she can attend and concentrate for two hours at a time for a total of eight hours, with the two customary 10-15 breaks, and a 30-60 minute lunch break.  She needs a sit-stand option every hour or so for one to two minutes or so, meaning that if she is sitting down, she can then stand for one to two minutes before sitting down and *vice-versa*, and she is further limited to occupations that allow her to use public transportation to and from the work site.

7    *Id.* at 23.  Accordingly, at step five, the ALJ found that "[b]ased on the testimony of the

8    vocational expert, the undersigned concludes that, considering the claimant's age, education,

9    work experience, and residual functional capacity, the claimant is capable of making a

10   successful adjustment to other work that exists in significant number in the national

11   economy."  *Id.* at 27.  As such, the ALJ found that Plaintiff was "not under a disability, as

12   defined in the Social Security Act, from September 9, 2009, through the date of this decision

13   (20 CFR 404.1520(g))."  AR at 28.  Plaintiff asserts that the ALJ erred in  1) rejecting the

14   opinions of treating physician Dr. Smith and examining physician Dr. Rothbaum without

15   "specific and legitimate" reasons supported by substantial evidence in the record; and 2)

16   finding Plaintiff's subjective complaints are not credible.  Pl.'s Opening Brief (Doc. 16) at

17   10-17.

18              **A.    *Plaintiff's Credibility***

19              Plaintiff asserts that the ALJ's articulated reasons for finding her subjective

20   complaints not credible do not "approach[] the law's stringent 'clear and convincing'

21   standard."  Pl.'s Opening Br. (Doc. 16) at 16.  The Commissioner argues that "[t]he ALJ

22   provided several valid reasons to support" his finding that Plaintiff's statements regarding

23   the intensity, persistence, and limiting effects of her symptoms were not entirely credible.

24   Def.'s Response (Doc. 17) at 4.  The Court agrees with the Commissioner.

25              "To determine whether a claimant's testimony regarding subjective pain or symptoms

26   is credible, an ALJ must engage in a two-step analysis."  *Lingenfelter v. Astrue*, 204 F.3d

27   1028, 1035-36 (9th Cir. 2007).  First, "a claimant who alleges disability based on subjective

28

symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'" *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014). Further, "the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.' *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282). "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d 1028 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and convincing" requirement had been excised by prior Ninth Circuit case law). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

"Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and 'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment.'" *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)); *see also Ghanim*, 763 F.3d at 1163. The Ninth Circuit Court of Appeals has "repeatedly warned[, however,] that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely

resting in bed all day." *Garrison*, 759 F.3d at 1016 (citations omitted).  Furthermore, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1287 n. 7 (citations omitted).  The Ninth Circuit Court of Appeals recently noted:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer.  The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Garrison*, 759 F.3d at 1016 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)) (alterations in original).  "While ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard." *Id.* at 1018 (emphasis in original) (discussing mental health records specifically). "Inconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination.  *Burrell*, 775 F.3d at 1137 (citing *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

Here, in assessing Plaintiff's credibility, the ALJ noted that "[s]he . . . maintains that she is only able to lift, at most, eight pounds."  AR at 25.  The ALJ went on to state that "[t]he record, however, does not support her alleged symptoms and limitations."  *Id.*  The ALJ points out that Plaintiff has been maintained on her pain medication "without any significant changes in her regimen[,]" that "physical examinations have not shown evidence of atrophy or muscle loss, and Dr. Smith has noted on several occasions that she has been doing well with medication." *Id.*; *see also* AR at 339-40, 399, 401, 453, 455.  A review of the record further indicates the Plaintiff reported that she was able to lift approximately fifteen (15) pounds as of August 2011. *Id.* at 224.  The ALJ also noted that Plaintiff "walks on her property's 'hiking trail' 2-3 times a week for approximately 20 minutes each time, and

swims laps approximately two times weekly for twenty minutes or so each time." AR at 25. The ALJ further noted that the "slight antalgic gait" Plaintiff exhibited in the consultative examination "has not been consistently demonstrated, including any observations by her primary care provider." *Id.* The ALJ also found Plaintiff's testimony and contradictory medical records regarding her drug and alcohol use as undermining her credibility. *Id.* at 25-26. Finally, the ALJ found that Plaintiff obtaining unemployment benefits from the State of Arizona, and holding herself out as capable of working and looking for work, negatively impacted her credibility. *Id.* at 26; *see also Copeland v. Bowen*, 861 F.2d 536, 542 (9th Cir. 1988) (receipt of unemployment benefits properly included in credibility analysis). Accordingly, the Court finds that the ALJ stated sufficient specific reasons for not fully crediting Plaintiff's pain testimony, supported by substantial evidence.

## B.     Treating and Examining Physician Opinions

Plaintiff asserts that the ALJ's rationales for rejecting the opinions of treating physician Dr. Smith and examining physician Dr. Rothbaum are not "specific" and "legitimate" and as such rejection of their opinions is contrary to law. Pl.'s Opening Br. (Doc. 16) at 11. The Commissioner argues that "the ALJ properly gave Dr. Smith's and Dr. Rothbaum's opinions the same weight as Plaintiff's own credibility." Def.'s Response (Doc. 17) at 10.

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)); *see also Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citations omitted)). "The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate

reasons' supported by substantial evidence in the record." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Embrey*, 849 F.2d at 421 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Moreover, "[e]ven if a treating physician's opinion is controverted, the ALJ must provide specific, legitimate reasons for rejecting it." *Id.* (citing *Cotton*, 799 F.2d at 1408). Additionally, "[a] physician's opinion of disability 'premised to a large extent upon the claimant's own account of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" *Morgan*, 169 F.3d at 602 (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citations omitted)).

Fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue." *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004) (citing *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech, Inc.*, 125 F.3d 794, 796 (9th Cir. 1997)). "Common symptoms . . . include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease." *Id.* at 590. "There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and 'the only symptom that discriminates between it and other diseases of a rheumatic character' multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia)[.]" *Rollins*, 261 F.3d at 855 (quoting *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)). As such, Plaintiff's physicians must rely to a large extent on her reporting to assess her level of pain.

The ALJ rejected Drs. Smith and Rothbaum's opinions, because they were

1    inconsistent with Plaintiff's own testimony.  *Cf. Tommasetti v. Astrue*, 533 F.3d 1035, 1041

2    (9th Cir. 2008) ("An ALJ may reject a treating physician's opinion if it is based 'to a large

3    extent' on a claimant's self-reports that have been properly discounted as incredible").  The

4    ALJ noted that Plaintiff's fibromyalgia was adequately controlled with medication, which

5    her medical records support.  *See, e.g.,* AR at 339-40, 399, 401, 453, 455.  The ALJ also

6    noted that Dr. Smith opined that Plaintiff was "limited to lifting and carrying five pounds

7    occasionally[.]" AR at 25.  As discussed in Section III.A., *supra*, this finding is not supported

8    by Plaintiff's own testimony.  The ALJ further points to Plaintiff's testimony regarding her

9    ability to exercise as undermining the physician's restrictive findings.  "[T]he ALJ provided

10   adequate reasons, under the appropriate legal standard, for finding that [Drs. Smith and

11   Rothbaum's] opinion[s] [were] not controlling."  *Rollins*, 261 F.3d at 856.  As such, the

12   ALJ's finding is affirmed.

14   **V.    CONCLUSION**

15       In light of the foregoing, the Court affirms the Commissioner's decision.

17       Accordingly, IT IS HEREBY ORDERED that:

18       1)    Plaintiff's Opening Brief (Doc. 16) is DENIED;

19       2)    The Commissioner's decision is AFFIRMED; and

20       3)    The Clerk of the Court shall enter judgment, and close its file in this matter.

21       DATED this 25th day of March, 2015.

23       _____

             Bruce G. Macdonald
24           United States Magistrate Judge